229 F.2d 622
 Richard C. NONGARD, Ellen Ketcham, as Executrix of the Estate of Tuthill Ketcham, Deceased, and Rowland H. Murray, Individually and as Partners Trading as Ketcham & Nongard, Appellants,
v.
BURLINGTON COUNTY BRIDGE COMMISSION, a Body Politic; David J. Connelly and William H. Wells, as Receivers, Appellees.
 No. 11733.
 United States Court of Appeals Third Circuit.
 Argued January 17, 1956.
 Decided February 3, 1956.
 
 Thomas C. Egan, Philadelphia, Pa. (Vincent L. Gallaher, Camden, N. J., on the brief), for appellants.
 Walter D. Van Riper, Newark, N. J. (Van Riper & Belmont, Newark, N. J., on the brief), for receivers.
 Robert L. Hood, Newark, N. J. (Thomas D. Begley, Burlington, N. J., on the brief), for Burlington County Bridge Commission.
 Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 The plaintiffs in this action, appellants here, are a Chicago brokerage and trading firm, Ketcham & Nongard, and the three individuals who are its members. They have sued Burlington County Bridge Commission, a corporate public agency of the State of New Jersey, and David Connelly and William Wells, receivers appointed by the Superior Court of New Jersey to collect from these plaintiffs and others personal money judgments entered against them in the case of Driscoll v. Burlington-Bristol Bridge Co., 1950, 10 N.J.Super. 545, 77 A.2d 255, modified on appeal, 1952, 8 N.J. 433, 86 A.2d 201.
 
 
 2
 In our recent opinion in B. J. Van Ingen & Co. v. Connolly, 3 Cir., 1955, 225 F.2d 740, we had occasion to summarize the matter involved in Driscoll v. Burlington-Bristol Bridge Co. We said:
 
 
 3
 "* * * The New Jersey suit was instituted by the Governor on behalf of the people of that State to invalidate transactions whereby a public agency, the Burlington County Bridge Commission, purchased certain toll bridges at an excessive price pursuant to a scheme conceived and engineered by a group of adventurers to obtain an unjustified profit of some three million dollars at the ultimate expense of the traveling and toll-paying public. The New Jersey court found that an involved series of financial transactions did yield such an improper profit. It also found that Tuthill Ketcham, Richard Nongard and Rowland Murray, who are partners and the sole members of the brokerage and trading firm of Ketcham and Nongard, were members of the wrongdoing group. In addition, the partnership was found to have participated actively in the illegal transactions. The decree, as modified pursuant to the mandate of the Supreme Court of New Jersey on appeal, obligated the wrongdoing individuals to pay $3,050,347 to the Burlington County Bridge Commission. Certain wrongdoers, among them Tuthill Ketcham and Richard Nongard, were made liable for the entire sum. The third partner, Rowland Murray, was made liable for $76,258.68." 225 F.2d at page 741-742.
 
 
 4
 For present purposes it may be informative to add that the money judgment of approximately $3,000,000 was the gross yield of the scheme to those who engineered it, allowing them no credit for certain services and transfers which they assert as valuable contributions by them to the bridge commission during the execution of the scheme.
 
 
 5
 Federal jurisdiction in the present suit is predicated upon diversity of citizenship and the additional fact that an issue is framed under the due process clause of the Fourteenth Amendment. In one count, the relief sought is an injunction to restrain the defendants from "collecting the judgment in the aforesaid action" together with a declaratory judgment that the state judgment is invalid as countervening the due process clause.
 
 
 6
 A separate count seeks a money judgment for $1,240,000, an amount allegedly supplied by the plaintiffs to the bridge commission as consideration for bonds which were subsequently invalidated by the aforesaid judgment of the New Jersey Superior Court. Plaintiffs set this claim up as a separate and distinct matter, not covered by the New Jersey suit.
 
 
 7
 In advancing their present claim for injunctive and declaratory relief in a federal court the plaintiffs cannot deny that the New Jersey action was an equity proceeding charging them as defendants with conspiracy, fraud and the exercise of improper influence upon a public agency; that they were personally before the court and defended the action, and that both the Superior Court and the New Jersey Supreme Court on appeal found that they had knowingly and actively participated in serious wrongdoing. Their present contention is that the remedy fashioned by the Supreme Court in modifying the judgment of the Superior Court so departed from the trial theory of the action as to constitute a denial of due process of law. In this connection the district court took judicial notice, as do we, of the fact that this alleged departure of the State Supreme Court from the theory of the pleadings and trial was made the subject of a petition for rehearing in that court, and that petition was denied without opinion by an order of February 11, 1952. The district court found no impropriety or denial of essential justice in the action of the New Jersey Supreme Court.
 
 
 8
 The district court also dealt with the distinct claim to restitution of $1,240,000. This claim involved no constitutional contention. Invoking the doctrine of res judicata, the district court concluded that this claim was foreclosed by the judgment in the New Jersey action.
 
 
 9
 We deal first with the count asking that enforcement of the New Jersey judgment be restrained. It is necessary at the outset that we consider whether Congress has not expressly prohibited the courts of the United States from thus interfering with the enforcement of a state judgment.
 
 
 10
 Section 2283 of Title 28, U.S.C.1952 ed., is a 1948 revision of the former Section 265 of the Judicial Code. The new section reads as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The superseded provision read: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." 28 U.S.C.1946 ed. § 379.
 
 
 11
 A number of cases decided under the earlier statute minimized the legislative prohibition by ruling that it permitted various judge-made exceptions to its sweeping language. Accordingly, injunctions occasionally were granted to restrain state proceedings initiated without jurisdiction or the enforcement of state judgments procured by fraud or under other circumstances making enforcement unconscionable. Wells Fargo & Co. v. Taylor, 1920, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205; Simon v. Southern R. Co., 1915, 236 U.S. 115, 35 S.Ct. 255, 59 L.Ed. 492; Chase Nat. Bank v. City of Norwalk, Ohio, 1934, 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894. Analytically it was very difficult to square such injunctions with the statutory prohibition. And in Toucey v. New York Life Insurance Co., 1941, 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, the Supreme Court reviewed the course of adjudication and stated that "The foundation of these cases is thus very doubtful." 314 U.S. at page 136, 62 S.Ct. at page 145.
 
 
 12
 The 1948 revision of the statute, with its new listing of the situations in which state proceedings may be enjoined, quickly became the basis for contradictory inferences concerning the propriety of such implied exceptions to the general prohibition as we are now considering. At one extreme, it has recently been argued that Wells Fargo & Co. v. Taylor and the similar cases cited above should be followed under the revised section despite all that was said in the Toucey case. See Greyhound Corp. v. Leadman, D.C.E.D.Ky.1953, 112 F.Supp. 237, adopting the reasoning of Moore, Commentary on the U.S.Judicial Code, 1949, 411, 414. However, the Court of Appeals for the Second Circuit has taken the position that "In the face of this policy [of avoiding federal-state friction], we think jurisdiction to enjoin state-court actions, other than those within the exceptions prescribed in Section 2283, may not be implied." International Union of Electrical Radio & Machine Workers, C. I. O. v. Underwood Corporation, 1955, 219 F.2d 100, 104. And that view is now nationally authoritative by reason of the decision of the Supreme Court in Amalgamated Clothing Workers of America v. Richman Bros. Co., 1954, 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600. Relevant excerpts from that opinion read as follows: "We need not re-examine the series of decisions, prior to the enactment of Title 28 of the United States Code in 1948, which appeared to recognize implied exceptions to the historic prohibition against federal interference with state judicial proceedings. * * * By that enactment, Congress made clear beyond cavil that the prohibition is not to be whittled away by judicial improvisation. * * * This is not a statute conveying a broad general policy for appropriate ad hoc application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions." 348 U.S. at pages 514, 515-516, 75 S.Ct. at page 454.
 
 
 13
 Thus, absent any special legislative authorization, a court of the United States must refrain from enjoining state judicial proceedings unless the situation comes within some defined concept of "aid [to] its jurisdiction" or "protect[ing] or effectuat[ing] its judgments." In our view it is not even arguable that either of these concepts is involved here. The plaintiffs are merely complaining that a New Jersey equity court which had them before it adjudicated a controversy controlled by state rather than federal law[1] in a way that was arbitrary and grossly unfair to them. In no meaningful sense can it be said that a federal court acts "in aid of its jurisdiction"[2] if it undertakes to enjoin what the state court has thus ordered. We conclude, therefore, that Section 2283 prohibits federal injunctive intervention here. It is also clear that the addition of a prayer for a declaratory judgment does not help the plaintiffs in their effort to impose a federal restraint upon the state proceedings. H. J. Heinz Co. v. Owens, 9 Cir., 1951, 189 F.2d 505, certiorari denied 342 U.S. 905, 72 S.Ct. 294, 96 L.Ed. 677.
 
 
 14
 This does not mean that we doubt the soundness of the district court's analysis of the merits of the case or its conclusion that the New Jersey courts have dealt with the present plaintiffs in a legally permissible way. But, however that may be, we think Section 2283 makes it clear that the plaintiffs may not have such relief as they seek.
 
 
 15
 There remains the claim for the restitution of $1,240,000, the alleged consideration for bonds of the commission issued to these plaintiffs and subsequently invalidated by the judgment of the New Jersey Superior Court. Plaintiffs say the New Jersey decision does not cover this subject matter. However, we agree with the district court that this issue has been foreclosed by the New Jersey judgment.
 
 
 16
 In refashioning the remedy on appeal in Driscoll v. Burlington-Bristol Bridge Co., the New Jersey Supreme Court ruled as follows: "Ketcham and Nongard as active participants in the illegal transaction are not holders in due course and the bonds held by them are null and void, except to the extent that the Chemical Bank has an interest therein as pledgee." 8 N.J. 433, 501, 86 A.2d 201, 234. We concede that this language does not in terms say that the wrongdoers shall not get back any consideration they may have given for the bonds, although it is not difficult to find that implication. The matter is clarified by certain additional rulings, which show that the New Jersey court considered and decided against any restitution whatever to the wrongdoers. Thus the court explicitly directed that the "bridge commission shall retain title to the bridges together with all other property of whatever kind acquired by virtue of this transaction and it shall not retransfer or pay out any portion thereof to the sellers." 8 N.J. at page 501, 86 A.2d at page 234. The designation "sellers" as used throughout the decision includes Ketcham and Nongard. Moreover, in the principal affirmative direction that the members of the wrongdoing group should pay the bridge commission some $3,000,000, the court considered and ruled against allowing these wrongdoers the benefit of any offsetting credit. It also refused to undertake the restoration of the status quo in their interest. This is the court's language:
 
 
 17
 "* * * The members of the selling syndicate must make restitution of that which they have received, for otherwise they will be unjustly enriched by their fraud at the expense of the public. They and their nominees are therefore liable to repay the $3,050,347 gross profit which they received for their stock as the result of this transaction and they are not entitled to any credit for the expenses incurred in effectuating the fraudulent scheme, for none of those expenses can rightly be said to have been of benefit to the bridge commission or the public it represents. Bell, Hanff, Ketcham, Nongard and Powell were the members of the selling syndicate who took an active part in consummating the sale and so we are of the opinion that they are the only ones who should be held both jointly and severally liable for the entire amount of the illegal profits. The remaining persons who as stockholders of the Burlington-Bristol Bridge Company shared in the profits are severally liable only for that which they each received. In the instant case the members of the selling syndicate cannot complain that complete rescission and restoration of the status quo cannot be made, for the circumstances which prevent such relief are entirely of their own making. They are hoist with their own petard." 8 N.J. at page 502, 86 A.2d at page 234.
 
 
 18
 The force of this language cannot be minimized by urging that the selling of the bridges to the commission, from which Ketcham and Nongard and their associates realized some $3,000,000, is distinct from the procurement of funds to enable the commission to finance this purchase, in which connection Ketcham and Nongard say they advanced $1,240,000 to the commission. For all of these steps were part of a single integrated scheme, conceived and planned by Ketcham and Nongard and their associates, and executed under their watchful supervision in one eventful day. The New Jersey Supreme Court fashioned a comprehensive remedy to correct the wrong inherent in the entire scheme and did not undertake to deal with it piecemeal. We think it is clear that the court considered and concluded that the wrongdoers were not entitled to set off any equities they might assert in connection with any part of the transaction, if it were considered alone, to mitigate their obligation to make restitution of the gross yield of the integrated scheme to them.
 
 
 19
 Whether the exact points now urged concerning the $1,240,000 item were advanced in the New Jersey suit we do not know. Certainly they did have relevancy and could have been advanced. For all aspects of the complicated financing and selling were before the New Jersey tribunal for whatever correction or reshaping a court of equity might decree to accomplish essential justice. We think the district court was entirely correct in saying that the restitution which plaintiffs now ask "would thwart the very judgment imposed upon them by the New Jersey Supreme Court." The issue is res judicata.
 
 
 20
 The judgment will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 An attempted removal of the suit to the district court failed. The cause was remanded for lack of any substantial issue controlled by federal law. Driscoll v. Burlington-Bristol Bridge Co., D.C.D. N.J.1949, 82 F.Supp. 975
 
 
 [2]
 The Reviser's Note to § 2283 makes this explanatory comment. "The phrase `in aid of its jurisdiction' was added to conform to section 1651 [the `all writs' section] of this title and to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts."